**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT R. MARTELL,**

                                        **Plaintiff,**

               **v.**                                        **7:06-CV-1108**
                                                                    **(FJS)**

**MICHAEL J. ASTRUE, Commissioner of**
**Social Security,[1]**

                              **Defendant.**

_____

**APPEARANCES**                              **OF COUNSEL**

**JEFFREY FREEDMAN ATTORNEYS**         **KEVIN BAMBURY, ESQ.**
**AT LAW**
3445 Winton Place, Suite 104
Rochester, New York 14623
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**      **SHEENA V. WILLIAMS-BARR, ESQ.**
**OFFICE OF REGIONAL GENERAL**
**COUNSEL – REGION II**
26 Federal Plaza, Room 3904
New York, New York 10278

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

        On April 1, 2003, Plaintiff filed an application for disability insurance benefits under

_____

        [1] Plaintiff filed his complaint on September 15, 2006, and named Jo Anne B. Barnhart, now the former Commissioner of Social Security, as Defendant.  On February 12, 2007, Michael J. Astrue took office as Commissioner of Social Security.  Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Court has substituted him as the named Defendant; no further action is required to effectuate this change.  *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Title II and Part A of Title XVIII of the Social Security Act ("Act"), in which he alleged that

September 1, 1999, was the date of onset of his disability.  *See* Administrative Transcript ("Tr.")

at 64-66.  On May 6, 2003, the defendant, Commissioner of the Social Security Administration

("SSA"), denied Plaintiff's application.  *See id.* at 39-42.  Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ") on May 30, 2003.  *See id.* at 46.

Plaintiff's hearing occurred in two parts before ALJ Steven A. De Monbreum.  The ALJ

began the hearing on January 19, 2005, via teleconference between Roanoke, Virginia, and

Rochester, New York, at which time Plaintiff appeared but did not testify; Plaintiff's counsel

requested a continuance to obtain additional medical evidence.  *See id.* at 16, 243-54.  The ALJ

completed the hearing on July 12, 2005, in Rochester, New York.  *See id.* at 255-305.  On

December 23, 2005, the ALJ issued a decision affirming the defendant and denying Plaintiff's

application.  *See id.* at 13-27.

On January 20, 2006, Plaintiff filed a request for review of the ALJ's decision.  *See id.* at

11-12.  On July 19, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's

decision; and, thus, the Commissioner's determination became final.  *See id.* at 5-7.

On September 13, 2006, Plaintiff commenced this action, seeking judicial review of the

ALJ's decision pursuant to 42 U.S.C. § 405(g).  *See* Dkt. No. 1.  In support of his argument that

the Court should reverse the ALJ and award him benefits, Plaintiff asserted that substantial

evidence did not support the ALJ's determination that his impairments did not prevent him from

performing substantial gainful activity.  Plaintiff argued that (1) the ALJ erred in rejecting the

opinions of his treating physicians, Dr. Stefanos and Dr. Whitbeck, and in attributing to Dr.

Stefanos "some kind of desire to help the Plaintiff by slanting his report towards a finding of

disabled," *see* Dkt. No. 5, Plaintiff's Brief, at 10-12; (2) the ALJ "punished" Plaintiff for performing routine day-to-day activities, *see id.* at 12-13; and (3) the ALJ failed to give proper weight to the subjective evidence of pain and disability given its consistency with the objective medical evidence, *see id.* at 13-14.

In opposition, the defendant moved for judgment affirming the ALS's decision and dismissing Plaintiff's complaint.  *See* Dkt. No. 4, Answer; Dkt. No. 7, Defendant's Brief, at 1.

## II. BACKGROUND

### A.    Personal history

Plaintiff was forty-six years old at the time of the administrative hearing.  *See* Tr. at 64, 263.  Plaintiff worked in the tool and die maker trade as a pattern maker at Frazer and Jones, a malleable iron foundry, from 1980 through June of 1992.  *See id.* at 90, 107.  In April of 1995, Plaintiff began work as a self-employed handyman, working three to four hours per day, two to five days per week.  From April through October of 1999, he worked at Brown's Berry Patch, a fruit farm, as a handyman.  *See id.* at 78, 265.  Plaintiff indicated that his job with Frazer and Jones was his longest term of employment.  *See id.* at 78, 90.  Plaintiff asserted that he became unable to work on September 1, 1999, due to lower back and leg pain.  *See id.* at 64, 77.  Finally, Plaintiff alleged disability due to impairments resulting from a lower back injury and degenerative disc disease.  *See id.* at 89.

### B.    Medical evidence in the record

Plaintiff's initial injury occurred on October 17, 1989, while he was working for Frazer

and Jones.  Plaintiff was lifting a metal plate pattern weighing approximately fifty to sixty

pounds, and it began to fall off of Plaintiff's elevated work surface.  Plaintiff attempted to catch

the falling metal plate, which caused him to twist and bend simultaneously.  Plaintiff, thereafter,

experienced the onset of low back pain and some left leg pain.  *See* Tr. at 131, 151, 267-68.


### 1. Bedros Bakirtzian, M.D.

Plaintiff received treatment from Dr. Bakirtzian, an orthopaedic surgeon, for his lower

back pain.  Upon examination on December 5, 1995, Dr. Bakirtzian found that Plaintiff's muscle

power, sensation and reflexes were all within normal limits.  His impression was chronic

mechanical lower back pain with a possible sciatic component.  On January 12, 1996, Dr.

Bakirtzian noted that Plaintiff had a magnetic resonance imaging scan ("MRI") of his

lumbosacral spine, which revealed degeneration of his L5-S1 disc without any frank disc

herniation.  He continued to note normal muscle power, sensation and reflexes and continued his

diagnosis of mechanical lower back pain.  *See* Tr. at 129.

On February 15, 1996, Dr. Bakirtzian noted that Plaintiff's chronic lower back pain

seemed to respond positively to physical therapy.  On March 28, 1996, he noted Plaintiff's steady

improvement with physical therapy.  Plaintiff, however, claimed that his lower back pain

prevented him from doing any form of physical work.  Dr. Bakirtzian explained to Plaintiff that

he would benefit from a vocational rehabilitation program.  *See id.* at 130.

Dr. Bakirtzian referred Plaintiff to the Seaway Orthopedics Physical Therapy and

Rehabilitation Center.  On January 22, 1997, Physical Therapist Kathleen Snouffer[2] found that Plaintiff could occasionally lift 22.3 pounds, frequently lift 11.1 pounds and constantly lift 5.6 pounds.  Ms. Snouffer found that Plaintiff had no limitation with respect to fine motor coordination of his hands, and she noted no restrictions with respect to Plaintiff's "heavy grasp" as tested on a hand dynamometer.  *See* Tr. at 132.  Ms. Snouffer also found that Plaintiff could occasionally perform bending and stooping activities, climbing activities, walking activities and crawling activities.  She found that Plaintiff could frequently perform squatting and crouching activities, reaching activities, kneeling activities, and repetitive leg movements involving the hip.

In addition, Ms. Snouffer found that Plaintiff could constantly perform repetitive arm movements and repetitive leg movements involving the knee and ankle joints but not the hip. She found that Plaintiff could stand, sit and drive for three to four hours with breaks every forty-five minutes.  Ms. Snouffer concluded that Plaintiff belonged in the light to medium lifting category.  Finally, she suspected that Plaintiff did not lift to his full ability during the

---

[2] The Regulations limit acceptable medical sources to "licensed physicians (medical or osteopathic doctors);" "licensed or certified psychologists;" "licensed optometrists, for purposes of establishing visual disorders only;" "licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle, only;" and "qualified speech-language pathologists, for purposes of establishing speech or language impairments only."  20 C.F.R. §§ 404.1513(a), 416.913(a).  The Regulations also provide that the SSA may use evidence from other sources to show how a claimant's impairments affect his ability to work.  Furthermore, the Regulations provide a non-exhaustive list of "other sources," which include medical sources such as "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists[.]" 20 C.F.R. § 416.913(d)(1); *see also Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 78 n.19 (N.D.N.Y. 2005) (explaining that "the Regulations do not classify therapists as medical sources, but rather as other sources which may be considered by the Commissioner . . . [and] may be accorded some weight" (citing 20 C.F.R. § 416.927, *Pogozelski v. Barnhart*, 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004)) (other citations omitted).  Thus Ms. Snouffer qualifies as an "other source," and the Court includes her assessment in its recitation of Plaintiff's medical record because of the ALJ's citation to that assessment in his decision.  *See* Tr. at 19, 23.

examination due to fear of reinjury: "[i]t seemed that he had a preconceived notion of what his capabilities were before he reinjures himself or causes himself increased pain." *See* Tr. at 133.


### 2. Stephen Bogosian, M.D.

On September 8, 2003, Dr. Bogosian evaluated Plaintiff's back and lumbar spine. Dr. Bogosian assessed low back pain, lumbar spondylosis[3] with no myelopathy[4] and LS spine degenerative arthritis. He ordered X-rays of Plaintiff's lumbar spine, which revealed evidence of facet degeneration at L4/5 and L5-S1 with degenerative spurring and decreased disc space at L5-S1. Dr. Bogosian recommended that Plaintiff return to his orthopedist in Rochester, New York, and opined that Plaintiff had a permanent disability in reference to his low back. *See* Tr. at 174.


### 3. P. Stephen Curtis, M.D.

Dr. Curtis, an orthopedic surgeon, examined Plaintiff on February 24, 1998. Dr. Curtis observed that Plaintiff walked on his heels and toes with adequate strength. He noted full range of motion of Plaintiff's hips, knees and ankles bilaterally and no evidence of motor or sensory deficit in the lower extremities. *See* Tr. at 154-55. Dr. Curtis' impression was that Plaintiff's condition was chronic low back pain with bilateral sciatica, suggesting a possible S1 distribution and degenerative disc disease at L5-S1. *See id.* at 155-56.

---

[3] Lumbar spondylosis is a degenerative joint disease that affects the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes. *See Dorland's Illustrated Medical Dictionary* 1780 (31st ed. 2007).

[4] Myelopathy is any of various functional disturbances or pathological changes in the spinal cord. *See Dorland's Illustrated Medical Dictionary* 1239 (31st ed. 2007).

**4. Stephen B. James, M.D.**

On February 4, 1999, Dr. James, an orthopaedic spine consultant, examined Plaintiff for

low back pain. Dr. James noted normal gait and that Plaintiff was able to perform tandem gait

without difficulty but that he had difficulty with toe and heel walking. *See* Tr. at 157. He

reviewed X-rays taken of Plaintiff's lumbar spine, which showed evidence of natural lumbar

lordosis. Plaintiff's disc space heights were maintained with the exception of L5-S1, which was

severely degenerated. There was evidence of anterior spur formation at the superior end plate of

S1 and inferior end plate of L5. There was no evidence of spondylolithesis[5] or spondylolysis.[6]

Dr. James' impression was degenerative disc disease at L5-S1 and low back pain with bilateral

lower extremity radiculopathy, secondary to the disc disease.

Dr. James suggested that an anterior lumbar interbody fusion would probably benefit

Plaintiff. Dr. James also discussed the possibility of Plaintiff's return to work, but Plaintiff "was

not anxious about re-entering the work force in any capacity." *See* Tr. at 158. Dr. James noted

that Plaintiff was focused on his current pain and that Plaintiff felt that he should continue his use

of chronic narcotic pain medication, for which he wanted a prescription. Dr. James explained

that he would not prescribe narcotic medication for any patient of his, but especially not for one

on whom he had not performed surgery. Dr. James concluded by noting that Plaintiff would

consider surgery with the "understanding that surgical intervention is multifaceted and would

---

[5] Spondylolithesis is the forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis. *See Dorland's Illustrated Medical Dictionary* 1779 (31st ed. 2007).

[6] Spondylolyis is the dissolution of a vertebra. *See Dorland's Illustrated Medical Dictionary* 1780 (31st ed. 2007).

include not only [a] decrease of low back pain and lower extremity radiculopathy but [also] a probable return to the work force and a cessation of narcotic use." *See id.* at 158.[7]

### 5. George R. Stefanos, M.D.

On February 5, 1999, Dr. Stefanos began his treatment of Plaintiff.  Plaintiff's chief complaint was back and leg pain.  Dr. Stefanos' impression was low back pain secondary to disc herniation.  He directed Plaintiff to continue taking as small a dose of Darvocet as possible.  *See* Tr. at 207, 231.  On April 8, 1999, Dr. Stefanos treated Plaintiff for back pain and continued his prescription for Darvocet.  *See id.* at 205, 232.  On July 20, 1999, he noted low back pain secondary to lumbar disc disease and referred Plaintiff for an MRI and neurologic evaluation.  He noted that Plaintiff "remains disabled at his current level of disability." *See id.* at 201, 237.

On October 12, 1999, Dr. Stefanos noted that Plaintiff's back symptoms had worsened, and he prescribed Darvon.  *See id.* at 199, 236.  On March 21, 2000, Dr. Stefanos noted that Plaintiff was suffering from back pain, and he continued his prescription for Darvon three times a day; he noted, however, that Plaintiff was "quite ambulant with the current dosing." *See id.* at 195, 234.  On May 1, 2000, Dr. Stefanos noted that Plaintiff was suffering from back pain but had "good pain relief" with his prescription of Darvon.  *See id.* at 194, 196, 233.  On December 7, 2000, Dr. Stefanos again treated Plaintiff for low back pain and continued Plaintiff's prescription for Darvon.  *See id.* at 193, 235.

---

[7] Plaintiff would later convey to another physician that he was not pleased with Dr. James' refusal to prescribe Darvon for him.  *See* Tr. at 179

Darvon is a preparation containing propoxyphene, an opioid analgesic structurally related to methadone.  *See Dorland's Illustrated Medical Dictionary* 479, 1551 (31st ed. 2007).

On November 19, 2002, Dr. Stefanos treated Plaintiff for congestion and low grade temperature.  He noted that Plaintiff was taking Darvon on a *pro re nata* – as needed – basis for his back pain.  *See id.* at 190.

Dr. Stefanos treated Plaintiff on January 2, 2004.  Plaintiff reported feeling alright but had some palpitations at times and some sense of chest heaviness.  Dr. Stefanos' impression was uncontrolled hypertension.  He admonished Plaintiff to decrease his salt intake and increase his amount of exercise.  Dr. Stefanos did not note any back pain.  *See* Tr. at 182.  On February 24, 2004, Dr. Stafanos noted that Plaintiff's blood pressure was very well controlled on Avapro 300 mg.  Dr. Stefanos did not note any back pain.  *See id.* at 220.  On April 5, 2004, Dr. Stefanos noted that Plaintiff was under a lot of stress and had been suffering from atypical chest pain.  A resting EKG, however, revealed no abnormality.  A repeat stress test at minimal exertion revealed some sinus tachycardia but no ST or T wave abnormality.  Dr. Stefanos noted that Plaintiff continued to take Darvon for his back pain.  *See id.* at 219.

Dr. Stefanos completed a physical capacities evaluation of Plaintiff.  He found that, in an eight-hour workday, Plaintiff could sit for one-half hour and could stand and walk for one-half hour.  Dr. Stefanos found that Plaintiff could frequently lift and carry between six and ten pounds.  He found that Plaintiff could not perform simple grasping with his right hand, could neither push nor pull arm controls, but could perform fine manipulation.  Dr. Stefanos found that Plaintiff could not use his feet for repetitive movements.  He found that Plaintiff was unable to bend, squat or crawl but that he could occasionally climb and reach.  Dr. Stefanos characterized Plaintiff's restriction of activities involving unprotected heights, being around machinery and driving automotive equipment as "total," his restriction of activities involving exposure to

marked changes in temperature and humidity as "moderate," and his restriction of activities involving exposure to dust, fumes, and gases as "none." *See id.* at 186.  Plaintiff reported that Dr. Stefanos prescribed 20 milligram doses of Benicar for his high blood pressure and 65 mg doses of Darvon propoxyphene for his back and leg pain.  *See id.* at 96, 110.

Dr. Stefanos also completed a medical source statement regarding Plaintiff's ability to do work-related activities.  He opined that Plaintiff could occasionally and frequently lift and/or carry less than ten pounds.  He also opined that Plaintiff could stand and/or walk for less than two hours in an eight-hour workday and that Plaintiff could sit for two hours in an eight-hour workday.  Dr. Stefanos opined that Plaintiff's back pain affected his ability to push and/or pull. He found, however, that Plaintiff could frequently, i.e., between one-third and two-thirds of an eight-hour workday, climb ramps, stairs, ladders, ropes and scaffolds and frequently balance, kneel, crouch, crawl and stoop and/or bend.  Finally, he found that Plaintiff's impairment caused no manipulative, visual/communicative or environmental limitations and concluded that Plaintiff had been unable to work since 1999.[8]  *See* Tr. at 224-27.


### 6. Michael G. Dunn, M.D.

On November 24, 1999, Dr. Dunn, a neurologist, examined Plaintiff.  *See* Tr. at 161-62. He noted that Plaintiff was not currently employed and had "chosen to remain [at] home taking care of his son as he is unable to work." *See id.* at 161.  Dr. Dunn noted moderate limitation of

---

[8] In noting Plaintiff's onset of limitations, Dr. Stefanos wrote "unable to work since 1999." *See* Tr. at 227.  Immediately following that answer appears "6/30/01."  The Court notes the "crossed-out" date because, as discussed below, the ALJ attributed some significance to this date in his decision. *See id.* at 24.

-10-

Plaintiff's lumbosacral range of motion, that he was able to walk on his heels and toes and could perform a squat. Dr. Dunn tested Plaintiff's muscle strength, which revealed "normal tone, bulk and strength throughout all muscles in the lower extremities." *See id.* A sensory examination to temperature, pin and vibration was normal. Internal and external rotations of Plaintiff's hips were normal while straight leg raising was benign. An L2-S2 radiculopathy screen was generally unremarkable bilaterally. Dr. Dunn's impression was that Plaintiff's low back pain was mostly mechanical and related to his severely degenerative disc at L5-S1. Dr. Dunn found no evidence of radiculopathy based on either his examination or electrodiagnostic studies. Finally, he wondered if the mild subluxation of L5 on S1 caused Plaintiff's H reflexes to appear borderline. *See id.*

### 7. M. Gordon Whitbeck, Jr., M.D.

On June 28, 1999, Dr. Whitbeck, an orthopaedic surgeon, examined Plaintiff. Dr. Whitbeck assessed low back pain, degenerative disc disease at L5-S1, and bilateral lower extremity radiculopathy. Dr. Whitbeck recommended that Plaintiff undergo an MRI of his lumbar spine, a lumbar discography, and a neurologic examination. *See* Tr. at 179-81.

On December 15, 1999, Dr. Whitbeck informed Plaintiff of the results of multiple diagnostic studies. Dr. Whitbeck explained to Plaintiff that the results of his neurologic evaluation, including electrodiagnostic studies that Dr. Dunn performed on November 24, 1999, did not suggest the presence of radiculopathy. An MRI of Plaintiff's lumbar spine taken on October 16, 1999, however, demonstrated the presence of severe degenerative disc disease at the L5-S1 level with associated trace degenerative spondylolisthesis. Dr. Whitbeck also noted that a

lumbar discography was performed on October 18, 1999. *See id.* at 159-60. In addition, he discussed with Plaintiff the benefits and risks of surgery and emphasized "that the results of surgery are somewhat unpredictable in terms of the extent to which . . . symptoms will be relieved." *See id.* at 159. Dr. Whitbeck concluded his entry by noting that "[a]t this point [Plaintiff] is considered to have a temporary marked partial disability." *See id.* at 160.

On October 6, 2003, Dr. Whitbeck again treated Plaintiff. He noted very similar symptoms as compared to his previous treatment of Plaintiff. Dr. Whitbeck noted that Plaintiff's strength was "5/5" to detailed testing while his sensation was intact to light touch. Plaintiff exhibited full range of motion of his hips and knees and stable gait. Dr. Whitbeck's assessment was chronic, persistent low back pain and bilateral sciatica. He noted that Plaintiff needed to undergo a myelogram to determine how his treatment should proceed. *See id.* at 176.

On June 17, 2004, Dr. Whitbeck performed a keyhole foraminotomy[9] C7-T1 (right) with decompression of the C8 nerve root on Plaintiff. *See id.* at 216-17. On July 30, 2004, Dr. Whitbeck noted that Plaintiff was six weeks post-surgery. Plaintiff stated that a little numbness lingered in the ulnar digits of his right hand. Dr. Whitbeck also noted that Plaintiff's surgical incision was well healed, that his strength was "5/5," and that his gait was stable. *See id.* at 215. On September 27, 2004, Dr. Whitbeck noted that Plaintiff was three and one-half months post-surgery. Plaintiff was not experiencing much neck pain and there was no radiation down his right upper extremity to his hand. Plaintiff's motor strength was "5/5" throughout. Finally, Dr. Whitbeck noted that Plaintiff remained disabled on the basis of chronic, persistent low back pain.

---

[9] Foraminotomy is the operation of removing the roof of intervertebral foramina for the relief of nerve root compression. *See Dorland's Illustrated Medical Dictionary* 740 (31st ed. 2007).

*See id.* at 214.

### 8. Steven P. Myers, M.D., Ph.D., and Scott Cholewinski, M.D.

On October 16, 1999, Dr. Myers and Dr. Cholewinski took an MRI of Plaintiff's back.

The MRI revealed evidence of degenerative disc disease at the L5-S1 level, where there were

anterior and posterior vertebral body osteophytes, anterior and posterior disc bulges, and findings

consistent with disc desiccation. There was no evidence of significant spinal canal stenosis and

no significant neural foraminal narrowing at that level. At the L3-4 level, they noted a small

posterior disc bulge but no significant spinal canal stenosis and no significant neural foraminal

narrowing. At the other lumbar levels, there was no evidence of significant posterior disc

herniation, spinal cord stenosis or neural foraminal narrowing. *See* Tr. at 198, 210.

### 9. Yugi Numaguchi, M.D.

On October 18, 1999, Dr. Numaguchi performed a discogram on Plaintiff. Dr.

Numaguchi found that the L3-L4 disc showed an "H shaped" configuration and that there might

be a small annular tear at the anterior-interior endplate. The L4-L5 disc appeared normal. The

L5-S1 disc was markedly degenerated and decreased in height. *See* Tr. at 229-30.

### 10. Testimony and other evidence in the record

Plaintiff provided testimony regarding his past work. In his work as a tool and die maker,

Plaintiff testified that he stood all day and lifted metal patterns weighing up to sixty pounds on a

daily basis. *See* Tr. at 267. Plaintiff classified his handyman work as home maintenance, which

included climbing step ladders as needed.  *See id.* at 266.  He also testified that he pursued work

as a handyman because it was the only other vocation that he "knew how to do."  *See id.* at 268-

69, 271.  Plaintiff testified that he collected worker's compensation benefits.  *See id.* at 264-65.

Plaintiff also provided testimony regarding his pain.  Plaintiff testified that, by the time he

would leave his job at Brown's Berry Patch for the day, his legs would be numb and he would

experience difficulty walking.  He stated that he lost feeling and strength in his legs for two hours

after working.  *See* Tr. at 272-74.  Plaintiff testified that, in 2000, the pain in his back increased

as his level of exertion increased.  *See id.* at 275.  He testified that the pain was centered at his

belt line and that it radiated out to his buttocks and legs.  Plaintiff testified that his pain affected

his ability to concentrate such that his short-term memory suffered.  *See id.* at 280-81.  He

testified that he slept for four to five hours a night due to pain.  *See id.* at 282.  Finally, Plaintiff

testified that he took painkillers to help manage his pain.  *See id.* at 276.

Plaintiff also provided some testimony regarding how his pain impacted his physical

abilities.  Plaintiff testified that he could sit for fifteen minutes at which point pain would start to

radiate up his back and down his legs; he would stand for ten to twenty minutes to alleviate the

pain.  *See id.* at 279-80.  He testified that he could walk 500 feet before having to sit due to pain

radiating down his back and legs.  Plaintiff testified that he could lift a gallon of milk out of the

refrigerator and carry it to his table.  *See id.* at 281.

Plaintiff's testimony and the record provide some insight into his activities of daily living.

Plaintiff indicated that he spent his days "moving around to different positions to try to relieve

back and leg pain."  *See id.* at 101.  He indicated that it was difficult for him to bend to put on

and take off pants, socks and shoes.  *See id.*  Plaintiff testified that he tended to his personal

hygiene daily but only when he "felt like [he] could get there and do it" and that he needed to move around and loosen up before tending to his personal hygiene.  *See id.* at 282-83.

Plaintiff identified woodworking, metal working, reading, and watching television as hobbies and interests.  He indicated that he engaged in woodworking for two hours a week but spent no time metal working.  *See* Tr. at 104.  Plaintiff also testified that he went fishing once a year.  *See id.* at 291.  He testified that he dined out occasionally but that he could not sit through a movie.  Plaintiff also testified that he read the newspaper.  *See id.* at 295-96, 298.

Plaintiff testified that his wife returned to work about a month after the birth of their son, at which point Plaintiff became "Mr. Mom" and lifted his son, who weighed eight or nine pounds, during the day.  *See id.* at 284.  Plaintiff testified that he later attended his son's recitals and kindergarten graduation, *see id.* at 296, and that he read short stories to his son, *see id.* at 298.

Plaintiff testified that he and his wife and son drove from Rochester, New York, to Massena, New York, at Christmastime to visit family and that Plaintiff handled most of the driving: "if I got [sic] to do it, I'm going to sit and do it.  And it's not easy.  It's really painful." *See id.* at 293-94.  Plaintiff testified that he and his family stopped four times en route.  *See id.* at 294.

Plaintiff indicated that he needed help with household chores and that, without help, he took a long time to complete them.  *See* Tr. at 103.  He indicated that he could drive and leave the house on his own.  *See id.*  Plaintiff also indicated that he shopped twice a week for one hour at a time.  *See id.* at 104.  He testified that his wife prepared his meals but that, if he prepared his own meals, it took twenty minutes or less.  *See id.* at 102.  Plaintiff testified that he could do

household chores for twenty minutes.  *See id.* at 303.  He testified that he tried to be as functional

around the house as he could, *e.g.*, dusting the table or putting away dishes.  *See id.* at 288, 298-

99.  He testified that he was in the process of building kitchen cabinets but that it had thus far

taken him three years.  *See id.* at 287.  He testified that his riding lawn mower irritated him and

that he had difficulty getting off it; his wife mowed sixty percent of the time.  Plaintiff testified

that he sprayed weeds with Roundup every six months.  *See id.* at 288.  Finally, at the hearing's

conclusion, he agreed with the ALJ that, during the time period in question, he was not bedridden

and could do some things but not on a sustained basis.  *See id.* at 303-04.


### III. DISCUSSION

**A.     Disability determination**

To be considered disabled, a plaintiff seeking disability insurance benefits or

supplemental security income disability benefits must establish that he "is unable to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> [also] cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work. . . .

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and

416.920, to evaluate disability insurance and supplemental security income disability claims.

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental
> ability to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the [R]egulations.  If the claimant has such an
> impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education, and
> work experience . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps.  However, if

the plaintiff establishes that his impairment prevents him from performing his past work, the

burden then shifts to the Commissioner to prove the final step.  *See Berry*, 675 F.2d at 467.


**B.     Scope of review**

In reviewing the ALJ's decision, in affirming the Commissioner, a court must determine

whether the ALJ applied the correct legal standards and whether there is substantial evidence in

the record as a whole to support that decision.  *See Rosado v. Sullivan*, 805 F. Supp. 147, 153

(S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)) (other citations

omitted).  A reviewing court, however, may not affirm an ALJ's decision if it reasonably doubts that the ALJ applied the proper legal standards even if it appears that there is substantial evidence to support that decision.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports his decision.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted).  A court's factual review of the ALJ's decision is limited to the determination of whether there is substantial evidence in the record to support that decision.  *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (citations omitted).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . .'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quotation omitted).  "It is more than a mere scintilla or a touch of proof here and there in the record."  *Id.*

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Id.* (citations omitted).  "However, a reviewing court cannot substitute its interpretation of the administrative record for that of [the ALJ] if the record contains substantial support for the ALJ's decision."  *Lewis v. Comm'r of Sec. Sec.*, No. 6:00 CV 1225, 2005 WL 1899399, *1 (N.D.N.Y. Aug. 2, 2005) (citations omitted).

In this case, the ALJ found that (1) Plaintiff met the disability insured status requirements of the Act on September 1, 1999, the date he alleged that he became unable to work but that he continued to meet such requirements only through June 30, 2001; (2) Plaintiff had not engaged in

substantial gainful activity since September 1, 1991; (3) the medical evidence established that,

prior to June 30, 2001, Plaintiff had degenerative disc disease of the lumbar spine and obesity,

which constituted "severe" impairments based on the Regulations' requirements specified at 20

C.F.R. § 404.1520(c); (4) during the relevant period, Plaintiff's medically determinable

impairments did not meet or medically equal one of the listed impairments in Appendix 1,

Subpart P, Regulation No. 4; (5) Plaintiff's allegations regarding his limitations were not totally

credible; (6) prior to June 30, 2001, Plaintiff had the RFC to perform work at the light level of

exertion;[10] (7) on September 1, 1999, Plaintiff was a "younger individual" as defined in the

Regulations at 20 C.F.R. § 404.1563; (8) Plaintiff had a "high school (or high school equivalent)

education;" (9) Plaintiff had no transferable skills within the meaning of the Regulations at 20

C.F.R. § 404.1568; and (10) based on an exertional capacity for light work during the relevant

period and Plaintiff's age, education and work experience, Medical-Vocational Rule 202.21

---

[10] The Regulations define light work as

> lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even though the
> weight lifted may be very little, a job is in this category when it
> requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or
> leg controls.

20 C.F.R. § 416.967(b).

The Regulations also provide that, if someone is capable of performing light work, then he is also capable of performing sedentary work absent "additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *Id.*  Sedentary work generally is defined as work that involves lifting up to ten pounds at a time and occasionally lifting and carrying light objects.  *See* 20 C.F.R. § 404.1567(a).  Such work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day."  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citations omitted).

directed a finding of "not disabled."  *See* Tr. at 26.  Based on these findings, the ALJ concluded

that Plaintiff was not under a "disability" within the meaning of the Act at any time relevant to

the ALJ's decision.  *See id.*

Plaintiff disputes a number of the ALJ's findings and his ultimate conclusion of non-

disability.  The Court will address each of Plaintiff's arguments in turn.

### 1. Treating physicians' opinions

An ALJ must give a treating physician's medical opinions "controlling weight" only if

they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and [are] not inconsistent with the other substantial evidence" contained in the record.  20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2); *see Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  Even if

substantial evidence contradicts the treating physician's opinion, which is thus not controlling,

that opinion still may be entitled to significant weight "because 'the treating source is inherently

more familiar with a claimant's medical condition than are other sources.'" *Santiago v. Barnhart*,

441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) (quoting *Gonzalez v. Callahan*, No. 94 Civ. 8747,

1997 WL 279870, at *11 (S.D.N.Y. May 23, 1997) (citing *Schisler v. Bowen*, 851 F.2d 43, 47

(2d Cir. 1988))).  An ALJ must "comprehensively set forth [the] reasons for the weight assigned

to a treating physician's opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20

C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or

decision for the weight we give your treating source's opinion.").

If the treating physician's opinion is not controlling, the proper weight that the ALJ gives

to that opinion depends on the following factors: (1) the "length of the treatment relationship and

the frequency of examination;" (2) the "nature and extent of the treatment relationship;" (3) the

medical evidence in support of the opinion; (4) the consistency of the opinion "with the record as a whole;" (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ's omission of this analysis is considered a failure to apply the proper legal standard and is grounds for reversal of the Commissioner's determination.  *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

Plaintiff argues that the ALJ erred by rejecting the opinions of his treating physicians, Dr. Stefanos and Dr. Whitbeck, which he asserts are supported by substantial evidence.  In his decision, the ALJ determined that neither Dr. Stefanos' nor Dr. Whitbeck's respective opinions were entitled to controlling weight under Social Security Ruling ("S.S.R.") 96-2p.  In crediting their opinions with "little weight," the ALJ noted that, in November of 1999, just two months after Plaintiff's onset date, Dr. Dunn found that Plaintiff was able to walk on his heels and toes and squat.  The ALJ noted that Dr. Dunn's muscle strength testing of Plaintiff revealed normal tone, bulk and strength throughout all muscles in the lower extremities.  The ALJ also noted Dr. Dunn's observation that internal and external rotations of Plaintiff's hips were normal and that straight leg raising was benign.  The ALJ further noted that Plaintiff had "chosen" to remain at home to take care of his son.[11]  *See* Tr. at 23, 161.  The ALJ also noted that, in March of 2000,

_____

[11] Plaintiff argues that, by omitting part of Dr. Dunn's statement, the ALJ robbed context from Dr. Dunn's note.  As noted above, Dr. Dunn's complete statement reads: "[Plaintiff] has chosen to remain home taking care of his son as he is unable to work."  *See* Tr. at 161.  In this instance, it appears that Dr. Dunn was merely recording what Plaintiff had told him during his visit; notably, in his impression, Dr. Dunn offered no opinion regarding Plaintiff's ability to work.  *See id.*  Moreover, as detailed above, on February 4, 1999, Dr. James discussed the possibility of Plaintiff's return to work, but Plaintiff "was not anxious about re-entering the work force in any capacity."  *See id.* at 158.  Therefore, the Court finds that it reasonably appears that

(continued...)

-21-

Dr. Stefanos had opined that Plaintiff was "quite ambulant with the current dosing [of Darvon]."

*See id.* at 23, 195, 234.  Furthermore, the ALJ noted that, in May of 2000, Plaintiff reported to

Dr. Stefanos that the prescribed pain medication offered good pain relief.  *See id.* at 23, 194, 196,

233.  The ALJ further cited to Dr. Stefanos' treatment notes from November of 2002, in which he

noted that Plaintiff was taking Darvon on an as-needed basis for his back pain.  *See id.* at 23,

190.

In support of his determination, the ALJ also cited Plaintiff's testimony.  The ALJ

explained that

> documentary evidence shows that the claimant was able to perform
> a wide variety of daily activities . . . includ[ing] caring for his
> infant son and maintaining a productive lifestyle. . . . Claimant's
> own activities of daily living demonstrate a level of functioning
> that exceeds those opined by [Dr. Stefanos and Dr. Whitbeck].
> Still further, claimant's lack of aggressive treatment and use of pain
> medication on an "as needed" basis is contrary to such opinions.

*See* Tr. at 23-24.

In explaining his determination that Plaintiff could perform light work, the ALJ had

earlier noted that Plaintiff was able to complete some household chores, mowed the lawn forty

percent of the time, sprayed weeds with Roundup, tended to a garden, cared for his personal

needs, cared for his son, operated a motor vehicle, and performed some woodworking activities.

*See id.* at 23, 104, 282-84, 288, 296, 298-99.

The Court finds that the ALJ set forth his rationale for the weight he assigned to Dr.

Stefanos' and Dr. Whitbeck's opinions.  Furthermore, the Court concludes that there is substantial

---

[11](...continued)
Plaintiff conveyed to Dr. Dunn that he had chosen to remain home and care for his son because
he felt that he was unable to work.

evidence in the record that contradicts Dr. Stefanos' and Dr. Whitbeck's restrictive opinions.

Moreover, Dr. Stefanos' and Dr. Whitbeck's respective findings of disability, *see* Tr. at 201, 214,

cannot themselves be determinative because the determination as to whether a claimant is

disabled is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1); S.S.R. 96-8p n.8;

*Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). "That means that the . . . [SSA] considers the

data that physicians provide but draws its own conclusions as to whether those data indicate

disability." *Snell*, 177 F.3d at 133.

Plaintiff also contends that the ALJ committed error in relying upon a functional capacity

evaluation that a physical therapist completed because the ALJ incorrectly stated that the

evaluation occurred in 1998. *See* Tr. at 23. The Court notes that, earlier in his decision, the ALJ

cited the correct date of this functional capacity evaluation – January 22, 1997. *See id.* at 19.

The Court hesitates to label what is more than likely an editorial or typing mistake as a fatal

error, particularly in light of the fact that the ALJ did not rely solely on the functional capacity

evaluation in affording Dr. Stefanos' and Dr. Whitbeck's respective opinions "little weight." *See*

*id.* at 24.

Plaintiff further objects to the ALJ's alleged insinuation that Dr. Stefanos' 2005 medical

source statement was biased in a "plaintiff-friendly" sense and was unduly influenced by

Plaintiff's counsel. Plaintiff argues that such an insinuation found no support in the record. *See*

Dkt. No. 5, Plaintiff's Brief, at 10. In support of his argument that the ALJ unfairly attributed a

sympathetic accommodation to Dr. Stefanos' opinion, Plaintiff submits the following: (1) at the

hearing on July 12, 2005, the ALJ stated that he "kind of smiled at some of the limitations that

[Dr. Stefanos] came up with,"[12] *see id.* at 12; and (2) in his decision, the ALJ stated that Dr. Stefanos "opines as to claimant's condition back to 1999; on the question of when the limitations arose, he initially wrote June 30, 2001, but changed his answer to 1999.  It appears he *may* have needed some prompting from counsel about the onset date."  *See* Tr. at 24 (emphasis added).

Assuming, for sake of argument, that the ALJ stated that he "kind of smiled at some of the limitations that [Dr. Stefanos] came up with," the Court notes that other courts have characterized as "obvious" the "point that a treating physician *may* be biased because of his longstanding relationship with a patient . . . ."  *Cullotta v. Bowen*, 662 F. Supp. 1161, 1170 n.26 (N.D. Ill. 1987) (emphasis added).  The Court, however, is reluctant to characterize the ALJ's remark as one evincing an overriding suspicion of Dr. Stefanos or definitively ascribing a bias to his opinion because there is nothing in the record to suggest that the ALJ had any interaction with Dr. Stefanos prior to Plaintiff's hearing.  Therefore, the Court concludes that there is nothing in the record to suggest that the ALJ considered any "prior dealings" with Dr. Stefanos in determining how much weight to assign to his opinion.[13]  *See Santiago*, 441 F. Supp. 2d at 628 (explaining that "[i]t is inappropriate for an ALJ to consider prior dealings with a physician when deciding how much weight to assign to the physician's opinion" (citing *Gonzales v. Apfel*, 113 F.

---

[12] Although Plaintiff purported to quote from the hearing on July 12, 1995, he did not cite the corresponding page in the administrative transcript.  The Court did not locate this particular quote in its review of the hearing transcript but notes that page 285 of the administrative transcript, which corresponds to page 31 of the hearing transcript, is missing from its copy and, thus, acknowledges the possibility that the quote appears there.  Neither party cites to page 285 in their briefs.

[13] The ALJ was apparently based in Roanoke, Virginia, at the Office of Hearings and Appeals, *see* Tr. at 49, 51-55, while Dr. Stefanos practiced medicine in Spencerport, New York, a suburb of Rochester, New York, *see, e.g.,* Tr. at 187, 209.

-24-

Supp. 2d 580, 589 n.14 (S.D.N.Y. 2000))).

Furthermore, the ALJ's statement in his decision that "on the question of when the limitations arose . . . [it] appears [Dr. Stefanos] may have needed some prompting from counsel about the onset date," clearly suggests that the ALJ believed Plaintiff's counsel may have exerted some undue influence on Dr. Stefanos.  However, beyond the crossed-out date referenced above – which is fairly subject to any number of alternative and less conspiratorial interpretations – there is nothing in the record to suggest that Dr. Stefanos changed his answer at the behest of Plaintiff's counsel.  Regardless, however, of whether the ALJ reasonably or unfairly ascribed a bias to Dr. Stefanos' opinion based on the undue influence of Plaintiff's counsel, in rejecting Dr. Stefanos' opinion, the ALJ did not solely rely on his apparent suspicion.  Rather, as explained above, the ALJ found that medical and documentary evidence did not support that opinion.[14]  After reviewing the entire record, the Court concludes that there is substantial evidence in the record to support the ALJ's decision.

### 2. Credibility and Plaintiff's day-to-day activities[15]

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical finds or other 'objective' medical evidence[.]"  *Marcus v. Califano*, 615 F.2d 23, 27 (2d

---

[14] Although Plaintiff did not specifically attribute bias to the ALJ, it is no great inferential leap to characterize Plaintiff's argument as leveling one of the most serious charges that a litigant can make – that the ALJ was biased against him.  To the extent that Plaintiff is, in fact, attempting to argue that the ALJ was biased against him, he has not demonstrated that the ALJ conducted the hearing in such a manner as to deprive it of fundamental fairness.

[15] The Court considers Plaintiff's second and third arguments in tandem.

Cir. 1979) (citations omitted).  The ALJ, however, retains discretion to assess the credibility of a

claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light

of medical findings and other evidence, regarding the true extent of the pain alleged by the

claimant."  *Id.*  When a claimant's testimony regarding pain suggests a greater severity of

impairment than the objective medical evidence shows, the ALJ must consider the following

factors in evaluating a claimant's symptoms and complaints of pain: (1) the claimant's daily

activities; (2) "the location, duration, frequency, and intensity of [the claimant's] pain or other

symptoms;" (3) "precipitating and aggravating factors;" (4) "[t]he type, dosage, effectiveness, and

side effects of any medication" that the claimant takes to alleviate pain or other symptoms; (5)

treatment, other than medication, the claimant has received for relief of pain or other symptoms;

(6) any measures the claimant uses to relieve pain or other symptoms; and (7) other factors

concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

If an ALJ rejects subjective testimony, he "'must do so . . . with sufficient specificity to

enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief . . . .'"

*Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (internal quotation and citation

omitted).  If there is substantial evidence in the record to support the Commissioner's findings,

"the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."

*Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citation

omitted).  Furthermore, the ALJ has the benefit of directly observing a claimant's demeanor and

other indicia of credibility, which thus entitles the ALJ's credibility assessment to deference.  *See*

*Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999) (citing *Pascariello v. Heckler*, 621 F. Supp.

-26-

1032, 1036 (S.D.N.Y. 1985)); *see also Snell*, 177 F.3d at 135 (citation omitted).

Regarding a claimant's performance of daily activities, the Second Circuit has noted that, "'when a disabled person gamely chooses to endure pain in order to pursue important goals[,]' . . . 'it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.'" *Balsamo v. Chater*, 142 F.3d at 81-82 (finding that the Plaintiff's church attendance and occasional shopping trips did not suffice to undermine his disability claim (quoting *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989))). Indeed, the Second Circuit has stated, on numerous occasions, that "'a claimant need not be an invalid to be found disabled' under the . . . [Act]." *Id.* at 81 (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) (quoting *Murdaugh*, 837 F.2d at 102 (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" nevertheless disabled because [she] could not perform sedentary work))); *see also Downey v. Barnhart*, 294 F. Supp. 2d 495, 502 (S.D.N.Y. 2003) (finding that a claimant's ability to raise his son and attend social security hearings using public transportation were insufficient to support the ALJ's determination that the claimant was not credible).

Plaintiff argues that the ALJ erred by finding him only partially credible without sufficient specificity as to his rationale. Specifically, Plaintiff contends that the ALJ made no specific findings grounded in the evidence and offered only a conclusory statement that Plaintiff's subjective complaints were out of proportion to the evidence and clinical findings in the record. *See* Dkt. No. 5, Plaintiff's Brief, at 14. Plaintiff also argues that the ALJ's finding that he is capable of light work because he can do some minor chores around the house was improper and unfairly punished him for his willingness to endure pain to provide minimal assistance in

operation of his household and the raising of his son.  *See id.* at 13.

Defendant counters that the medical evidence and the laboratory findings do not support Plaintiff's subjective statements about his pain and symptoms.  *See* Dkt. No. 7, Defendant's Brief, at 7.  Defendant further argues that the scope of Plaintiff's activities far exceeds the occasional trip out of the house.  *See id.* at 8.

In his decision, the ALJ found that the "claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision."  *See* Tr. at 26.  The ALJ characterized Plaintiff's testimony regarding his alleged limitations and daily activities as "inconsistent."  *See id.* at 22.  The ALJ also found that the evidence failed to "establish that the claimant's pain is so severe and intractable as to prevent the performance of all work activity," and concluded that the "claimant's allegation concerning inability to work prior to July 1, 2001, is not supported by the evidence of record."  *See id.* at 22-23.  In reaching that conclusion, the ALJ explained that he considered the limitations that Plaintiff alleged during his testimony and found that they were "only partially credible."  *See id.* at 22.  The ALJ further explained that the objective evidence and clinical findings of record were "out of proportion to the claimant's subjective complaints . . . ."  *See id.*

In support of his conclusion, the ALJ noted Plaintiff's daily activities and emphasized that, after Plaintiff's wife gave birth to their child and returned to work, Plaintiff opted to stay home and rear their son.  The ALJ also noted that Plaintiff was able to complete some household chores, mowed the lawn forty percent of the time, sprayed weeds with Roundup, tended to a garden, cared for his personal needs, cared for his son, operated a motor vehicle, performed some woodworking activities, occasionally fished, and occasionally dined out.  *See id.* at 18, 23, 104,

-28-

282-84, 288, 296, 298-99.

Furthermore, the ALJ discussed the location and intensity of Plaintiff's pain.  He noted that Plaintiff reported experiencing back pain and numbness and weakness in his lower extremities and noted that Plaintiff reported experiencing pain at a level of eight out of ten.  *See* Tr. at 18.  The ALJ noted the effectiveness of the medication that Plaintiff took to alleviate pain or other symptoms.  He also noted that Plaintiff reported in May of 2000 that his prescribed pain medication offered good relief of the pain and that, by November of 2002, Dr. Stefanos indicated that Plaintiff was taking his prescribed medications on an as-needed basis.  *See id.* at 23.  The ALJ acknowledged other treatment Plaintiff received for relief of pain, noting that, in March of 1996, Plaintiff reported steady improvement with his physical therapy treatments.  *See id.* at 19.  The ALJ further reviewed Plaintiff's work history, specifically noting that Plaintiff had worked as a tool die maker and as a self-employed handyman.  *See id.* at 17, 23.

Although the ALJ's discussion of the factors set forth in 20 C.F.R. § 416.929 that led him partially to reject Plaintiff's subjective claims is less than comprehensive, his decision, nonetheless, explains in sufficient detail the basis for his credibility determination, which draws the support of substantial evidence.  Therefore, the Court defers to the ALJ's credibility determination and affirms his decision in this regard.

## IV. CONCLUSION

After carefully reviewing the entire record in this case, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the Commissioner's final decision denying disability benefits is

-29-

**AFFIRMED** and Plaintiff's complaint is **DISMISSED**; and the Court further

      **ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case.

**IT IS SO ORDERED.**

Dated: March  31, 2009
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge